UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 2: 10-77-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| FERNANDO GALVAN, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*\* \*\*\*\* \*\*\*\*

This matter is pending for consideration of Defendant Fernando Galvan's Motion to Suppress. [Record No. 15] Galvan is seeking the suppression of all evidence and statements obtained as the result of a warrantless, routine safety check. Because the Court concludes that KRS § 281.755 is constitutional under *New York v. Burger*, 482 U.S. 691 (1987), and because Sergeant Hall's actions were objectively reasonable, were taken in good faith, and were based upon reliance of a statute that was not clearly or flagrantly unconstitutional, Galvan's motion will be denied.

**I.**

On November 13, 2010, Galvan was driving a commercial box truck on I-71 in Boone County, Kentucky. Galvan was stopped by Sergeant Christopher Hall of the Boone County Sheriff's Department and was given instructions to follow the officer to a weigh station for a "routine safety check." At the conclusion of the inspection conducted at the weigh station,

Sergeant Hall ran Galvan's Texas Commercial Driver's License (CDL), which returned an NCIC match for a prior deportation in 2007. Sergeant Hall contacted the United States Department of Homeland Security to investigate. Thereafter, Galvan was interviewed by Special Agent Cook. During the interview, Galvan allegedly admitted that he had been previously deported and had not received permission to re-enter the country.[1]

On December 9, 2010, Galvan was indicted for violation of 8 U.S.C. §§ 1326(a)(2) and (b)(2): illegal re-entry by a removed alien. Galvan now seeks suppression of all evidence because he asserts that the original stop, as well as the investigation begun and any information received as a result of the stop, violated the Fourth Amendment.

**Testimony and Evidence Presented During the Suppression Hearing**

On this date, the Court held an evidentiary hearing on the Motion to Suppress. During this hearing, Sergeant Hall testified concerning his background and qualifications to conduct safety inspections of commercial vehicles in the Commonwealth of Kentucky. Additionally, Sergeant Hall explained the circumstances surrounding the safety stop of Galvan's vehicle on November 13, 2010.

Sergeant Hall has been employed by the Boone County Sheriff's Department since March 25, 2002. He became a member of the CITE Unit on February 28, 2007, after receiving two weeks of additional training at the Department of Criminal Justice in

---

[1] On the day in question and prior to stopping Galvan, Sergeant Hall had stopped a number of vehicles for routine safety inspections. His goal was to stop at least 32 vehicles so that he could maintain his yearly certification as a member of the Criminal Interdiction and Traffic Enforcement Unit ("CITE").

Richmond, Kentucky. This training includes knowledge of and compliance with pertinent commercial vehicle regulations applicable in the United States and Kentucky. This training and subsequent certification enables Sergeant Hall to conduct inspections in accordance with a Memorandum of Agreement entered into by the Kentucky State Police and Boone County.

During his testimony on direct examination, Sergeant Hall explained that he conducts three levels of inspections of commercial vehicles. The first-level includes a comprehensive safety inspection of the outside of a vehicle, followed by review of required paperwork supplied by the driver. Although this inspection is more thorough than other types of inspections, it is limited according to the statutory framework under which it is authorized. The second-level of inspection was described as a "walk-around" and driver inspection which includes review of relevant paperwork (bill of lading, lawbook, driver's license, including CDL review, if applicable). Finally, the third-level inspection consists of a review of paperwork supplied by the vehicle's driver.

On the date in question (November 13, 2010), Sergeant Hall was conducting random commercial vehicle inspections on Interstate 71. His vehicle was pulled off the interstate and located in an area which allowed Hall to observe oncoming traffic. After observing a commercial vehicle subject to inspection, Sergeant Hall would pull behind the vehicle in his marked car, activate his lights, and require the subject vehicle to stop, usually near a weigh station. If the traffic stop proceeded according to plan, paperwork would be taken from the driver of the subject vehicle for inspection, and the driver would be directed to pull into an covered inspection lane so that inspection of the outside and undercarriage of the vehicle

could be performed in a safe area. After inspecting the vehicle, Sergeant Hall would then check the paperwork supplied by the driver to insure compliance with applicable regulations. Sergeant Hall testified that, on the date in question, he was attempting to complete the 32 yearly inspections required for him to remain certified.[2]

It is undisputed that Galvan was stopped as part of the random inspection procedure being conducted by Sergeant Hall on November 13, 2010. The business record prepared by Sergeant Hall reflects that the initial stop of the commercial vehicle being driven by Galvan commenced at 2:27 p.m. and was completed in approximately thirty minutes. The report notes that three violations were found: (i) an excessive oil and grease leak underneath the engine at axle #1 (49 C.F.R. § 395.5(b)); (ii) a Record of Duty violation (49 C.F.R. § 395.8); and (iii) a failure to retain previous seven days records of duty status (49 C.F.R. § 395.8(k)(2). Under the applicable regulations, inspectors such as Sergeant Hall have discretion regarding whether to cite drivers for the violations listed in Hall's report. Here, in light of the subsequent decision to arrest Galvan on the underlying charges in this case, Sergeant Hall chose not to cite Galvan or the owner of the vehicle he was driving for the safety violations he observed.

The Uniform Citation introduced as United States' Exhibit 2 during the hearing on the defendant's motion to suppress indicated that Galvan was arrested by Sergent Hall at the

---

[2] Sergeant Hall testified that, as of November 13, 2010, he needed to perform approximately 12 inspections of commercial vehicles to remain certified. He has received permission from his supervisor to attempt to complete all of these inspections on November 13, 2010.

weigh station at approximately 3:24 p.m. However, the citation also indicates that the violation of KRS § 440.270(2) occurred at 2:27 p.m. (*i.e.*, the time Galvan was initially stopped for the safety inspection. Sergeant Hall testified that, before citing and arresting Galvan, he preformed a check of Galvan's Texas driver's license, found that Galvan had been previously deported as an illegal alien, and conferred with Immigrations and Customs Enforcement for instructions.

On cross-examination, Sergeant Hall confirmed that, under the applicable Kentucky statute governing safety inspections of commercial vehicles, inspectors have a great deal of discretion regarding the time and location of conducting such inspections. Specifically, inspectors may stop vehicles on any roadway and at any time. However, he noted that such inspections were specifically limited in scope and outlined in the relevant provisions of the state and federal regulations. With respect to the inspection of Galvan's vehicle, Hall testified that, prior to the stop, he did not observe any safety violations. Instead, he chose Galvan's truck as a means of getting his quota of 32 vehicle inspections.

Sergeant Hall testified that, upon activating his lights, Galvan pulled his vehicle into the single lane of the exit to the weigh station. Hall approached the truck, obtained the relevant paperwork and Galvan's driver's license, and then directed Galvan to pull forward into the inspection lane. After inspecting the vehicle, Sergeant Hall prepared the report which lists the three violations outlined above (United States' Exhibit 1). Hall then ran a check of Galvan's driver's license and confirmed that he had been deported previously. At that point, he determined that Galvan would be arrested, but not cited for the three violations.

**II.**

The fact that no "search" occurred in this case does not exclude the circumstances from Fourth Amendment protection. The Supreme Court has explained that a police officer's stop of a vehicle, even if only to check the driver's license and registration, is subject to Fourth Amendment scrutiny. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979) ("The *Fourth* and *Fourteenth Amendments* are implicated in this case because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief.") Because Sergeant Hall's actions amount to a seizure and were not taken pursuant to a valid warrant, the government must show that his actions fit within one of the well-defined exceptions to the Fourth Amendment's warrant requirement. *See United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) ("A warrantless search or seizure is 'per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967))).

The United States correctly asserts that Sergeant Hall's search falls within an exception for administrative searches of property involved in pervasively regulated industries. *See New York v. Burger*, 482 U.S. 691, 700 (1987). In *Burger*, the Supreme Court explained that "[b]ecause the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy . . . and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable withing the meaning of the Fourth

Amendment." *Id.* at 702. The Court further established a three-part test for when the government may subject pervasively regulated businesses or industries to warrantless searches. *Id.* In order for a statute authorizing such searches to pass constitutional muster, the Court must find that: (1) there is a "substantial regulatory interest that informs the regulatory scheme"; (2) inspections are necessary to advance the regulatory agenda; and (3) the regulatory scheme "perform[s] the two basic functions of a warrant": provide notice to the owner and limit the discretion of the inspecting officers. *Id.* at 702–03.

Galvan asserts that KRS § 281.755 fails the *Burger* analysis; however, this argument is without merit. There is no debate that KRS § 281.755 easily passes the first two prongs of *Burger*. Commercial trucking is, without question, a pervasively regulated industry. *See* KRS § 281.600 (Kentucky's general commercial trucking regulations); 601 K.A.R. 1:005 (adopting 49 C.F.R. §§ 40, 382–83, 385, and 390–97, the federal commercial trucking regulations); *United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004) ("For purposes of the *Burger* doctrine, we see no meaningful distinction between commercial premises and commercial vehicles."); *United States v. Dominguez-Prieto*, 923 F.2d 464, 468 (6th Cir. 1991); *Meghoo v. Kentucky*, No. 2003-1074, 2004 Ky. App. LEXIS 316 (Ky. Ct. App., Oct. 29, 2004) ("[C]ommercial trucking is a pervasively regulated industry for purposes of the administrative search exception."). Additionally, the substantial interests of the government in regulating the industry are "evident." *Dominguez-Prieto*, 923 F.2d at 468; *see Maldonado*, 356 F.3d at 135 ("As to the first criterion, it cannot be gainsaid that the government has a significant interest in regulating the interstate trucking industry (*e.g.*, to ensure traveler

safety, hold costs in check, and restrict what commodities may be transported interstate).")."). Further, the second prong — the need for inspections to further the regulatory scheme — is also easily met by the statute at issue. *See Maldonado*, 356 F.3d at 135–36 ("[W]e think it self-evident that warrantless inspections of commercial trucks are necessary to further the regulatory scheme. Because the industry is so mobile, surprise is an important component in an efficacious inspection regime."); *see also Dominguez-Prieto*, 923 F.2d at 469 ("As was the case in *Burger*, warrantless inspections are critical to the regulatory scheme [over commercial trucking]."). Therefore, Galvan's only plausible argument is that the statute fails under the third prong of *Burger*.

*Burger*'s third prong requires that the statute put property owners on notice of possible searches and provide some limits on the discretion of inspecting officers. *See* 482 U.S. at 703. As to the first element, the Kentucky and federal regulatory schemes themselves put truckers on notice that they are subject to searches. *See* 49 C.F.R. § 390.3(e)(2) (adopted by 601 K.A.R. 1:005, Section 2(5) and requiring commercial drivers to be familiar with the applicable regulations); *Maldonado*, 356 F.3d at 136 ("[T]he regulations themselves give ample notice to interstate truckers that inspections will be made on a regular basis."); *Meghoo*, 2004 Ky. App. LEXIS 316, at *20 ("In our view, the statutory/regulatory scheme in Kentucky puts commercial drivers on notice that warrantless inspections may be conducted to check for possible regulatory violations.").

Galvan contends that KRS § 281.755 does not adequately limit the discretion of the inspecting officers. The central flaw, Galvan asserts, is that "a peace officer can stop a

vehicle without having any belief that a violation was occurring before the stop." [Record No. 15, p. 3] He finds it particularly convincing that the Sixth Circuit upheld a Tennessee truck-inspection statute because, *inter alia*, the statute required a "'reasonable belief' that a violation [was] occurring" in order to initiate a stop. *Dominguez-Prieto*, 923 F.2d at 469. Kentucky's statute does not contain a similar limitation. *See* KRS § 281.755. However, the Sixth Circuit noted in *Dominguez-Prieto* "that the inspection scheme in *Burger* required no level of suspicion." 923 F.2d at 469. The *Burger* Court further explained that "[i]t was unclear from the record why, on that particular day, Burger's junkyard was selected for inspection." 482 U.S. at 694 n.2. The Sixth Circuit has, likewise, upheld the constitutionality of administrative searches in the absence of an articulable limit on which trucks, or businesses, may be searched. *See United States v. Branson*, 21 F.3d 113, 117 (6th Cir. 1994) ("The fact that the officers used no articulable method in deciding to inspect Branson's business does not distinguish this case from *Burger*. . . . Here, as in *Burger*, the reason for the inspection is not material."). As these cases show, a threshold suspicion requirement is not *per se* necessary to uphold the regulatory scheme.

In fact, adding such a requirement would make the *Burger* exception altogether superfluous. If the Court were to require an officer to possess a reasonable and articulable suspicion of a violation before making an administrative stop, the stop would fall under the *Terry* exception. *See Terry*, 392 U.S. at 20. Pervasively regulated industries would not be subject to any greater surveillance or intrusion than a normal citizen. Galvan's argument, if adopted, would cut directly against *Burger*'s rationale and holding. *Id.* at 702. ("Because the

owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy . . . and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable withing the meaning of the Fourth Amendment."). Further, such a requirement would be very difficult to meet. As the Kentucky court noted in *Meghoo*, violations of the regulatory scheme are often not apparent to a patrolling officer. 2004 Ky. App. LEXIS 316, at *19. Because trucks move at such high speeds, inspections are often the only way in which violations can be discovered. *Id.* Adding a reasonable suspicion requirement for an administrative search is illogical, and the Court declines to do so.

Additionally, the statute does place limits on inspections. *See* KRS § 281.755(1). It limits who may search ("The Department of Kentucky State Police or any other peace officer designated by the department") and what they may search for ("for the purpose of ascertaining whether or not any provision of this chapter . . . has been violated"). The officer may only search vehicles within the purview of the statute. *Id.* (limiting searches to "any motor vehicle operating under the provisions of this chapter"). Further, there is no evidence in this case that Sergeant Hall went outside the scope of the limited inspection authorized by KRS § 281.755. *See State v. McGillicuddy*, 646 A.2d 354, 355 (Me. 1994) (upholding the validity of a statute authorizing an administrative inspection of a potato packing house under *Burger*'s third prong in part because "there is nothing in the record that remotely suggests any abuse of discretion on the inspector's part").

In conclusion, KRS § 281.755, taken as a whole, places adequate limits on the discretion of inspecting officers. It thus passes each of *Burger*'s three prongs. Accordingly, the Court finds that KRS § 281.77 is a constitutional statute permitting the warrantless administrative inspection of commercial vehicles.

Further, even if the statute were not constitutional, the Court would not exclude the evidence in question. Courts have repeatedly held that the exclusionary rule does not apply when an officer acts in good faith — in "objectively reasonable reliance upon a statute" — even though the statute upon which he relies may ultimately be found unconstitutional. *Illinois v. Krull*, 480 U.S. 340, 355 (1987). The "objectively reasonable officer test" sets a high bar for defendants. As the Supreme Court has explained, "[p]olice are charged to enforce laws until and unless they are declared unconstitutional. . . . Society would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979); *see also United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1117 (10th Cir. 2007) ("Reasonable officers . . . do not arrogate to themselves the right to second guess the people's representatives, except in the most extreme of cases."). "The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality — with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *DeFellippo*, 443 U.S. at 38. Thus, for the Court to exclude the evidence in question, Galvan would have to show that KRS § 281.755 is so

"flagrantly unconstitutional" that a reasonable officer could not help but question its validity. In light of the analysis above, he has completely failed to do so.

Other courts have found that similar statutes have passed the same inquiry. *See, e.g.*, *United States v. Steed*, 548 F.3d 961, 970–74 (11th Cir. 2008) (finding that Alabama's truck-inspection statute, although lacking meaningful limitations on time, place, or which vehicles to inspect, was not "clearly unconstitutional under *Burger*'s third prong for purposes of applying the good-faith exception in *Krull*"). Ultimately, considering the constitutional analysis above, the Court cannot say that the statute is so lacking in restraint on officers' discretion as to be "flagrantly unconstitutional." *See Krull*, 480 U.S. at 359–60 ("While statutory provisions that circumscribe officers' discretion may be important in establishing a statute's unconstitutionality, the additional restrictions on discretion that might have been necessary are not so obvious that an objectively reasonable police officer would have realized the statute was unconstitutional without them."). Therefore, under *any* circumstance, Galvan's suppression motion fails.

## III.

Based on the above analysis, the Court concludes that KRS § 281.755 is constitutional. Further, it was objectively reasonable for Hall, a well-trained officer, to rely on the validity of the Kentucky statute. The officer's conduct satisfies *Krull*'s good-faith exception, and the evidence will not be excluded. Accordingly, it is hereby

**ORDERED** that Defendant Fernando Galvan's Motion to Suppress [Record No. 15] is **DENIED**.

This 7th day of February, 2011.



Signed By:
*Danny C. Reeves* DCR
United States District Judge